UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD T. COOK, *et al.,* | ) | |
| | ) | CASE NO.  5:20-cv-665 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| | ) | |
| SPRINGFIELD TOWNSHIP, *et al.,* | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Before this Court is a fully briefed motion for summary judgment filed by the Village of Lakemore ("Lakemore") (Doc. Nos. 69, 74, 77) and a fully briefed motion for summary judgment filed by Richard Justice, Lakemore's former mayor (Doc. Nos. 70, 75, 76).  Also before the Court is Defendants' fully brief joint motion for judgment on the pleadings as to Count Eleven.  (Doc. No. 78, 79, 80.)  For the reasons stated below, Lakemore's summary judgment motion is GRANTED.   Mayor Justice's summary judgment motion is GRANTED. Defendants' joint motion for judgment on the pleadings is GRANTED.

**I.**   **Facts**

Springfield Township is located in Summit County, Ohio.  Lakemore is a statutory village within Summit County.  Lakemore is organized and bound by state law.  (Doc. No. 38-1 at 276.)[1]  *See* Ohio Const. art. XVIII, sec. 1.

In 2009, facing a fiscal emergency, Lakemore dissolved its police department.  (Doc. No.

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

1

38-2 at 325.)[2]  From 2009 until 2017, Lakemore contracted with Springfield Township to provide police services within Lakemore.[3]  (*Id.* at 324.)

From 2004 to 2009, Kenneth Ray was Chief of the Lakemore Police Department.  (*Id.*)  From 2009 to 2017, he served as Captain with the Springfield Township Police Department ("STPD").  (*Id.*)  In that role, "he was assigned as liaison to Lakemore," according to a contract between Lakemore and Springfield Township, discussed below.  While a captain with the STPD, Captain Ray supervised officers working in Lakemore.  (*See id.*)

In 2017, Lakemore reinstated its own police department.  (*Id.*)  Captain Ray was named again as Lakemore's Chief of Police.  (*Id.*)

###### A.    Contract Between Lakemore and Springfield Township

Lakemore's governing council adopted resolutions approving renewable annual contracts with Springfield Township for police services.  (*See, e.g.*, Doc. Nos. 69-1, 74-7.)  The resolution for services for the year 2016 provided:

> A RESOLUTION AUTHORIZING THE MAYOR TO ENTER INTO A CONTRACT WITH THE BOARD OF TRUSTEES FOR SPRINGFIELD TOWNSHIP FOR THE PROVISION OF POLICE SERVICES WITHIN THE VILLAGE OF LAKEMORE, PURSUANT TO THE TERMS OF THE ATTACHED CONTRACT TO THIS RESOLUTION AND FURTHER IN THE PERFORMANCE OF THEIR DUTIES PURSUANT TO THE ATTACHED CONTRACT THAT THE SPRINGFIELD TOWNSHIP POLICE DEPARTMENT, IT'S [*sic*] AGENTS AND EMPLOYEES SHALL BE CLOAKED WITH ALL OF THE POLICE AUTHORITY FOR THE VILLAGE OF LAKEMORE
>
> Be it Resolved by the Council of the Village of Lakemore, Ohio:
>
> Section 1: That the Mayor is authorized to enter into a contract with the

---

[2] Ohio law defines "a fiscal emergency of a municipal corporation," Ohio Rev. Code § 118.03, and prescribes various remedial measures and consequences, *id.* §§ 118.05-118.99.

[3] References to Captain Ray reflect his time as a Captain in the Springfield Township Police Department.  References to Chief Ray reflect actions he took after returning to the Lakemore Police Department in 2017, unless otherwise indicated.

Board of Trustees for Springfield Township for the provision of Police Services within the Village of Lakemore, pursuant to the attached contract to this Resolution and further in the performance of their dudes pursuant to the attached contract that the Springfield Township Police Department, it's [*sic*] agents and employees shall be cloaked with all of the Police Authority for the Village of Lakemore.

\* \* \*

Section 3: A copy of the contract is attached hereto and made part hereof as if fully rewritten herein.

(Doc. No. 69-1 at 2362; *see also* Doc. No. 74-7.)

The contract between Lakemore and Springfield Township contains a number of clauses that provide context for the present dispute, including these in Section 2:

e. Springfield Township will provide Lakemore with full police support and protection in the same manner that it provides such services to all areas of Springfield Township.

f. Residents of Lakemore will receive courteous and professional treatment by the officers assigned for duty there in the same manner as provided to residents of Springfield Township.

g. All Springfield police officers will be granted the right to exercise all of the same police powers and all other law enforcement rights granted to the Village of Lakemore.

(Doc. No. 69-1 at 2364.)

And these clauses in Section 3:

f. Lakemore will provide and maintain:

i. two police cruisers including fuel, to be dedicated for use by officers assigned to duty in Lakemore; and

ii one vehicle including fuel for use of the Captain assigned as liaison to Lakemore.

iii. One cruiser will be equipped by Lakemore with a MDT (Mobile Data Terminal), cost estimated at $5,000.00, with service at $85.00/month. Lakemore will also provide and maintain the service on one cellular telephone.

\* \* \*

3

       h.     Lakemore will retain and maintain custody, ownership, and responsibility for maintenance of all its presently owned police equipment, furniture, furnishings, personnel files, record of investigations, work product and contents of any evidence room.

(*Id.* at 2365.)

    4. Joint review committee:

       a.     There shall exist a joint review committee, with three members appointed by each, the Lakemore Village Council and the Springfield Township Trustees. Joint Review Committee may meet at least once every six months.  The function of this committee shall be to review the success of this Contract, to analyze the actual costs of providing services to Lakemore and to assess the adequacy of the services provided.  The committee shall report to their respective appointing authorities as to their findings.

    5. Release:

       a.     Springfield Township will not be liable and is released from any claims, causes of action, or expenses of any kind or nature which are asserted against Lakemore in connection with Springfield Township's fulfillment of its obligations under this Agreement.

       b.     Lakemore acknowledges and understands that Springfield Township's insurance provider only provides insurance coverage to Springfield Township, and that Lakemore must maintain its own insurance coverage.

       c.     The Lakemore Fiscal Officer and the Springfield Fiscal Officer shall each provide to the other proof of liability coverage . . . .

(*Id.* at 2365-66.)  In addition to other payments, "Lakemore shall also be responsible to pay Springfield Township for the following: . . . Overtime incurred by reason of the work or absence from work of officers assigned to Lakemore."  (*Id.* at 2364.)

    That contract was signed on behalf of Lakemore by Mayor Justice.  (Doc. No. 38-1 at 277-78.)

## B.    Mayor Richard Justice

    Mayor Justice was a self-employed contractor.  (*Id.* at 275.)  In 2008, he entered Lakemore politics when he was appointed to fill a seat on the village council.  (*Id.*)  During his

council tenure, the police force accounted for a large portion of Lakemore's general budget.  (*Id.* at 277.)  In 2012, he was elected mayor and remained in that position until the end of 2020.  (*See id.*)

Mayor Justice denied that a Lakemore mayor could or should supervise the police or act in a capacity as marshal.  (*Id.* at 276.)  Mayor Justice further testified that during his mayoral tenure, there were no procedures or policies related to policing in light of the contract with Springfield Township.  (*Id.* at 277-78.)  Although the Lakemore-Springfield contract provided for a joint review committee, Mayor Justice testified that he did not recall that body ever meeting or doing anything.  (*Id.* at 278.)  Mayor Justice did not know how the STPD officers were trained, nor did he have any problems with how they performed in Lakemore.  (*Id.*)

Mayor Justice also did not think that being mayor made him the chief enforcement officer as to ordinances or the "ultimate enforcer of anything in the Village, other than, you know, guiding these things along."  (*Id.* at 282-83.)  However, due to the fiscal emergency and cutbacks on village personnel, Mayor Justice admitted that he was involved in ordinance enforcement: "we're all wearing all the hats at this point, trying to stay afloat, and trying to get out of fiscal emergency."  (*Id.* at 283.)  In or around 2013, Lakemore adopted a new code regarding rental properties.  (*Id.* at 280-81.)

### C.    Plaintiff Richard Cook and Susan Lindsley

Richard T. Cook ("Cook") owned three businesses that are co-Plaintiffs here: TMK King, Inc. ("TMK"); Middlebury Banc, Inc. ("Middlebury Banc"); and Whole-Sale Bedding, Inc. ("Whole-Sale Bedding") (collectively "Plaintiffs").  Cook and his companies engaged in real estate acquisition, rentals, mattress sales, and licensing.  (Doc. No. 74 at 2504.)

For around 10 years, Susan Lindsley ("Lindsley") worked with Cook and TMK as an independent contractor to oversee the purchase of houses in foreclosure and rehab of those for

5

resale.  (Doc. No. 72-1 at 2438, 2440.)  For around 27 years, Lindsley worked as an assistant to Cook's brother, an attorney.  (*Id.* at 2439.)  Lindsley was also self-employed as a provider of loan closing and notary services for real estate transactions.  (*Id.* at 2437-38.)

### D. Lindsley's Campaign for Mayor

In 2015, Lindsley ran as a write-in candidate against incumbent candidate Mayor Justice. (*Id*. at 2478.)  Cook alleged that he publicly backed Lindsley's campaign.  (Doc. No. 1-1 at 11.)[4]

In late 2015, Lindsley attended an event where she voiced her criticisms of Mayor Justice – including Lindsley's belief that Mayor Justice was engaged in corrupt practices.  (Doc. No. 72-1 at 2444-47.)  In 2015 and in 2016, Lindsley filed complaints with the Ohio Attorney General against Lakemore's mayor.  (*Id.* at 2447.)

Mayor Justice testified:

Q:     . . . How would you – you know, so there was a campaign, I believe – am I wrong – that you ran in, would it have been 2015, with Susan Lindsley as your opponent; is that the right year?

A:     I think so, yeah.

Q:     Susan Lindsley made a number of accusations.  And she made a number of accusations, I believe, at one of the – I don't know whether it was a debate or a public meeting of the candidates.  Do you remember her making accusations against you?

A:     You know, I did not participate in that candidates night.

Q:     Oh, you didn't.

A:     No. I didn't feel I needed to.  And I knew it was going to be kind of, you know, a rally.

Q:     Uh-huh.

A:     So I stayed away.

Q:     Okay.  Well, I mean, how did you feel about her accusations?  I mean, I

---

[4] Plaintiffs' summary judgment papers do not include or point to evidence in support of that allegation.

6

think specifically she raised concerns about your relationship with CT Consultants, and accused you of corruption regarding block grants, and grant funding, and city contracts.  Are you aware of those accusations?

A:   Yeah, I just thought it was so preposterous, it didn't bother me.  Nobody would believe it.  It's ridiculous, it's outrageous.  You know, it's one of those things, you feel like, well, it's better for me not to even respond, it's just so out of line.  Actually, it was something that I just kind of blew off.

Q:   Well, I appreciate that, you know.  But at that point, when she was making those accusations, were you then paying more attention to what she was doing in the community?

A:   No.  You know, I didn't need to.  And if you see the election results, I didn't need to respond.

Q:   Uh-huh.

A:   I think I got 72 percent of the vote, or whatever.  Susan did her own thing, she could say her own stuff, it was fine with me.  It's America, you know, let her say whatever accusations she wants to say.  It was untrue, and it was ridiculous enough that nobody would believe it, that knew me.

Q:   Well, shortly after that campaign, my understanding is that an investigation started of Susan Lindsley and Richard Cook.  Are you familiar with that investigation?

A:   Oh, yes, I am familiar with that investigation.

Q:   Tell me how you became initially aware of the investigation.

A:   I believe it was Officer Mizer came to me after speaking with an Andy, that was in a real estate deal with Susan.

Q:   Uh-huh. And what did she say to you when she came to you?

A:   I couldn't follow the whole logic of the whole thing.  But I think her point was, she felt that there was something going wrong there, and she wanted to investigate, I believe.

Q:   And why did she come to you, particularly?

A:   You know, I think because it's a small town, I'm the Mayor, and she wanted me to know about it.

Q:   Did you then give her approval to pursue the investigation?

A:   No. You know, my – the way I operate is always, you know, the police are

> trained to do police work.  If they find that there's something there that
> they need to investigate, then they investigate it.  And you know, if she
> wants to keep me posted, that's fine with me.  I have no – you know, what
> she was saying and what I was hearing, and you know, how she figured
> that this was illegal was her business, was her training.

(Doc. No. 38-1 at 283-84.)

### E.  Law Enforcement Personnel

Jamie Mizer ("Officer Mizer") was a police officer in the STPD.  (Doc. No. 38-3 at 364.)

Officer Mizer conducted an investigation of Plaintiffs and executed the search warrants that are a

focus of Plaintiffs' claims in this lawsuit.  Captain Ray approved the actions taken by Officer

Mizer in her investigation.  (Doc. No. 38-4 at 440.)

Officer Mizer later came to believe that both Captain Ray and Mayor Justice pushed the

criminal investigation of Cook and Lindsley for reasons other than legitimate law enforcement

purposes.  (*See* Doc. No. 38-3 at 367-78.)  Eventually Officer Mizer became concerned with

potential corruption involving Captain Ray, Mayor Justice, and others.  (*See id.* at 378.)

> Q  . . . From your observations and being the lead investigator, looking
> backwards, right, taking all the facts and evidence and your experience
> into consideration, it is your belief that Ken Ray and Rick Justice worked
> together, conspired against Rich Cook and Susan Lindsley, but that you
> were not a part of that conspiracy?
>
> A:  Yes, that is how I feel.

(*Id.* at 395 (objections omitted).)

### F.  Officer Mizer's Investigation of Cook

On January 4, 2016, Captain Ray told Officer Mizer that he had been trying to put

together a RICO case against Lindsley and Cook.  (*Id.* at 367.)  Captain Ray permitted Officer

Mizer to investigate Cook and Lindsley in relation to several properties and past transactions.

(*Id.*)  The potential crime, in Officer Mizer's view, was alleged forgery in connection with real

estate transactions in Lakemore.  (Doc. No. 38-4 at 444.)

8

Officer Mizer conducted her investigation as a STPD officer and, in so doing, followed STPD policies and procedures.  (*Id*. at 440.)  Officer Mizer testified that the Cook/Lindlsey investigation was conducted pursuant to the joint agreement between Lakemore and Springfield Township.

> Q:    And so this was a criminal investigation. The criminal investigation into
>       Susan Lindsley and Richard Cook, this was a Springfield Township
>       investigation; is that right?
>
> A:    It was, as a result of our joint agreement to patrol the Village of Lakemore.
>
> Q:    So –
>
> A:     We had jurisdiction over Lakemore, so yes, it was ours.
>
> Q:    And so ultimately the responsibility for this investigation into Rich Cook
>       and Susan Lindsley was with the Village of Lakemore, wasn't it?
>
> A:    Yes.

(Doc.  No. 38-3 at 394.)

### G.    The Search Warrant

On March 15, 2016, Officer Mizer executed an affidavit in support of a search warrant. (Doc. No. 69-2.)  In it, Officer Mizer identified Samantha Becker ("Becker") as a source of the information supporting a determination of probable cause.  Officer Mizer also detailed the following: Cook transferred title to a house on First Street in Lakemore from his company TMK to a woman named Samantha Becker; this transfer was without Becker's knowledge or consent; the transfer obligated Becker to a $20,000 private mortgage owed to Middlebury Banc, another Cook-owned company; Becker already owned the First Street house mortgage-free, according to Officer Mizer's review of property records; and that Cook and Lindsley likely recorded a forged deed with respect to that house.  (*Id.* at 2376-78.)

In deposition, Officer Mizer admitted that Becker was unaware of any possible crime

9

until Officer Mizer approached Becker and began asking questions.  (*See* Doc. 38-3 at 410.)

Officer Mizer also testified that Becker repeatedly referred to an oral, non-written contract.  (*Id.*

at 411-12; *see also id.* at 412 (including testimony that "it was nicknamed real estate case, but it

wasn't a real estate case . . . the crimes investigated were forgery, identity theft and theft); *id.* at

413 ("I wasn't investigating the transfer of property.  I was investigating signatures and

notarizations and documents that were created and signed, without people's consent.  It had

nothing to do with how it was transferred.")

In any event, Officer Mizer incorporated the story she procured from Becker into her

affidavit.  Based on that affidavit, search warrants were obtained from and signed by local

Judges in Summit and Portage Counties.  (Doc. Nos. 69-2, 69-3.)

However, Becker filed an affidavit in this Court denying nearly all that Officer Mizer

attributed to her in support of the search warrant.  (*See* Doc. No. 74-1; *see also* Doc. No. 74-2

(affidavit of Ms. Becker's daughter ("B. Becker").)

## H.     Search and Seizure at Cook's Home and Companies

Officer Mizer informed Mayor Justice about at least one of the search warrants.  (Doc.

38-1 at 286, 288, 295-96.)  On March 16, 2016, at approximately 8:00 am, police arrived at

Cook's home to execute a search warrant.  (Doc. No. 40-1 at 497.)

Authorities seized truck titles, business records, and a computer belonging to Cook or one

of his businesses.  (*Id.* at 489.)  The authorities apparently told Cook's employees that the

business was closed and that they should not come back to work.  (*Id.*)  Mayor Justice had a

conversation with Captain Ray immediately after the execution of the warrants.  (Doc. No. 38-1

at 291.)  No information has been provided to this Court about the substance of these

conversations.

The property seized on March 16, 2016, was not returned until April 14, 2018.  (Doc. No.

40-1 at 499.)  However, Cook claimed that of the approximately $239,000 in total cash seized at the search locations, $27,000 was missing.  (*Id.* at 499.)  Cook also maintained that a cellular phone, notes, and certain business records were seized and never returned.  (*Id.* at 499-500.)

## I.  Perceived Pressure from Mayor Justice and Captain Ray

Officer Mizer testified that the actions of Mayor Justice and Captain Ray made her feel pressured to indict Cook and Lindsley.  (Doc. No. 38-3 at 381-82.)  Officer Mizer suspected that Mayor Justice and Captain Ray tried to delay the release of seized property as leverage in civil litigation involving Cook, Mayor Justice, and Captain Ray.  (*Id.* at 382 83.)

Officer Mizer believes that she was later retaliated against by Springfield Township for Officer Mizer's "not retaliating enough against Rich Cook and Susan Lindsley."  (*Id.* at 394.)

## II.  <u>Law and Analysis</u>

### A.  Standard of Review

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine dispute of

material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

" "Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). "[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id.*; *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) and (e). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

"The fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).  "It is true that both parties seek to resolve this case through the vehicle of cross-motions for summary judgment, but the standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).  "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

> ### B.      Municipal Liability

Because the thirteen claims originally pleaded named Lakemore as a defendant, the Court begins with a summary of *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny.  "In *Monell*, the Supreme Court explained that municipal liability under Section 1983 may only attach where the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury' complained of.  Thus, [plaintiffs] must prove two basic elements: (1) that a constitutional violation occurred; and (2) that the [defendant government entity] 'is responsible for that violation.'"  *Graham ex rel. Est. of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (quoting *Doe v. Claiborne Cty.*, 103 F.3d 495, 505-06 (6th Cir. 1996)).

"Axiomatically . . . [t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act. . . ."  *Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156, 1165 (6th Cir. 2021) (quoting *Andrews v. Wayne County*, 957 F.3d 714, 725 (6th Cir. 2020)).  Thus, "the constitutional violation of a municipal official is a prerequisite to municipal

liability." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 404 (6th Cir. 2015).  But "there is no vicarious liability based on the acts of its employees alone." *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020).

Plaintiffs "must prove that the municipality's policy or custom caused the alleged injury." *Ellis v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006).  "A plaintiff . . . must identify the policy, connect the policy to the [Village] itself and show that the particular injury "was incurred because of the execution of that policy.'" *Graham*, 358 F.3d at 382 (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.)).  Four ways to show municipal liability include: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014).

"[A] plaintiff would not need to establish a pattern of past misconduct where the actor was a policymaker with final policymaking authority." *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986)).  "Official municipal policy includes . . . the acts of its policymaking officials . . . ." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotations and citations omitted).  So "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur*, 475 U.S. at 481.  Accordingly, "the policy which ordered or authorized an unconstitutional act can be established by a single decision by proper municipal policymakers." *Id.* at 482 n.11.  Deciding "whether an official had final policymaking authority is a question of state law." *Id.* at 483.

14

Officer Mizer was not a policymaking official.  She and Chief Ray are no longer named defendants.  The remaining individual defendant Mayor Justice has asserted qualified immunity defenses.  The absence of pending claims against individual public employee defendants does not preclude potential municipal liability, however.  "Under the law of this circuit, a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to qualified immunity."  *Garner*, 8 F.3d at 365; *see also Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005); *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000).

### C.    Lakemore's Contract Defense to Municipal Liability

Lakemore raises a global argument as to why it may not be deemed liable for actions taken by the police at the time of the events at issue.  Citing its contract with Springfield Township, Lakemore suggests that it "did not have a police department and had no involvement, authority, or control" over Officer Mizer.  (Doc. No. 69 at 2343.)  Lakemore reasons that its inter-municipal contract eliminated "any jurisdiction, authority over, or right to control the township's police officers."  (*Id*. at 2345-46.)  Further, Lakemore argues, Ohio law would not allow Springfield Township to "delegate or contract away the township's responsibility to control, manage, supervise, or discipline township police officers."  (Doc. No. 77 at 2631.)  In short, Lakemore contends that by virtue of the contract, Lakemore itself was incapable of having policymaking authority vis-à-vis Township police officers working inside the Village.  (*See* Doc. Nos. 69, 77.)  That argument is unconvincing based on Ohio law and the negotiated contract terms.

### 1.    Statutory Authority for an Outside Police Force

"All municipal corporations *may* organize and maintain police . . . departments, erect the

necessary buildings, and purchase and hold all implements and apparatus required therefor."
Ohio Rev. Code § 715.05 (emphasis added).[5]  This language is permissive, not mandatory.  *State
ex rel. Ohio Civ. Serv. Emps. Ass'n v. City of Coshocton*, 448 N.E.2d 834, 835 (Ohio Ct. App.
1982) ("[A]ll or additional protection might be obtained by contract.  It then becomes equally
obvious that if all police protection might be obtained by contract that the municipal corporation
is not required to maintain its own department.").  "Under Ohio law, a municipal corporation is
not required to have a police force.  Moreover, a municipal corporation is statutorily allowed to
abolish its police force and contract with a county sheriff's office for police services."  *Wanless
v. Village of S. Lebanon*, 118 F. App'x 967, 969 (6th Cir. 2005) (citing *Coshocton*, 448 N.E.2d at
835).  For example, a village may eliminate its full-time police officers for economic reasons or
in a fiscal emergency – as happened in Lakemore.  *See Chaney v. Village of Potsdam,* 2005-
Ohio-603, 2005 WL 362658, at *12 (Ohio Ct. App. 2005); *Baurichter v. Village of Addyston*,
509 N.E.2d 80, 80 (Ohio Ct. App. 1986); *Toth v. Village of Elmwood Place*, 485 N.E.2d 735,
737 (Ohio Ct. App. 1984).

Ohio law authorizes one municipality to contract with another or with a township for the
use of the latter's police force.  *See* Ohio Rev. Code §§ 737.04, 505.50;[6] *see also Beans v. City of*

---

[5] *See also* Ohio Rev. Code § 737.11 ("The police force of a municipal corporation shall preserve
the peace, protect persons and property, and obey and enforce all ordinances of the legislative
authority of the municipal corporation, all criminal laws of the state and the United States . . . .").

[6] Lakemore's motion initially suggested that the contract was made pursuant to Section 505.431.
As Plaintiffs correctly point out, that provision is addressed to townships providing police
services *in the absence of* a contract with another government unit.  (Doc. No. 74 at 2512-13.)
*See* Ohio Rev. Code § 505.431 ("The police department of any township . . . may provide police
protection to any . . . municipal corporation, or township of this state . . . without a contract to
provide police protection, upon the approval, by resolution, of the board of township trustees of
the township . . . .").  On reply, Lakemore acknowledges that Section 505.431 is inapplicable and
acknowledges that Section 505.50 is the source of statutory authority for the contract with
Springfield Township.  (Doc. No. 77 at 2630.)

*Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *9 (N.D. Ohio Dec. 30, 2016) ("Further, section 737.041 permits a police department of any municipality to provide police protection, upon approval, to any other municipality."), *aff'd*, 706 F. App'x 295 (6th Cir. 2017).

That said, both sides here concede that Lakemore did not have the power to contract away a duty that state law makes mandatory for a mayor or marshal. (*Compare* Doc. No. 77 at 2632 *with* Doc. No. 74 at 2513-14.) "A municipal corporation is without power to enter into contracts which delegate or bargain away its legislative or governmental powers, or which disable it from performing its public functions and duties." *State ex rel. Gordon v. Taylor*, 79 N.E.2d 127, 127 (Ohio 1948) (syllabus by the court).

## 2.    The Lakemore-Springfield Township Contract

The resolution adopted by Lakemore and signed by its mayor provided that STPD officers serving by contract within Lakemore's municipal boundaries were "cloaked with all the Police Authority of the Village of Lakemore." (Doc. 69-1 at 2362.) The contract to that effect was attached to and adopted in the resolution. (*Id.*) That contract provided: "All Springfield police officers will be granted the right to exercise all of the same police powers and all other law enforcement rights granted to the Village of Lakemore." (*Id.* at 2364.) A joint review committee was created with members appointed by and answerable to the Lakemore Village Council and the Springfield Township Trustees. (*Id.* at 2366.)

All citizen concerns and complaints raised by Lakemore residents regarding police were handled by a Captain, whose particular salary and duties are addressed in the contract. (*Id.* at 2364-65.) The Captain specially tasked with oversight of Lakemore-related policing was Kenneth Ray, who previously served as Chief of the Lakemore police department. (*See* Doc. No. 38-2 at 325, 327.) After the fiscal emergency ended, Lakemore reconstituted its own police

17

force, and Captain Ray was reinstalled as Lakemore's Chief.  (*See id.* at 325.)

### 3.  The Marshal

Although not required to employ its own police force, Ohio law does require that a

municipality designate someone as its marshal.  "Each village shall have a marshal, designated

chief of police, appointed by the mayor with the advice and consent of the legislative authority of

the village . . . ."  Ohio Rev. Code § 737.15;[7] *see also* 1989 Ohio Op. Att'y Gen. 2-328 (1989);

*Mineral City v. Render*, 42 N.E. 255, 255 (Ohio 1894).

> [A] Village that desires to comply with the law that requires it to have a marshal
> designated as a chief of police must do so according to the dictates of ORC §
> 737.15.  Failure to comply with the clear and simple dictates of this section cannot
> be corrected by letters referring to a person as a chief of police, [or] by members of
> council calling him chief of police . . . .

*Parker v. Vill. of New Paris*, No. CA97-09-023, 1998 WL 265274, at *4 (Ohio Ct. App. May 26,

1998).  "The chief of police is made the executive head of the department under the direction of

the mayor."  *State ex rel. Moyer v. Baldwin*, 83 N.E. 907, 911 (Ohio 1908); *see also* Ohio Rev.

Code § 737.19(A) ("The marshal of a village has exclusive authority over the stationing and

transfer of all deputies, officers, and employees within the police department of the village,

under the general rules that the mayor prescribes."); *see also* Ohio Rev. Code § 733.24 ("The

mayor of a village . . . shall be the chief conservator of the peace therein . . . ."); *id.* at § 733.30

(providing that a mayor "shall see that all ordinances, bylaws, and resolutions of the legislative

authority are faithfully obeyed and enforced").

---

[7] The use of "shall" indicates that the above roles and functions for a village mayor and marshal
are mandatory.  *Wilson v. Lawrence*, 81 N.E.3d 1242, 1245 (Ohio 2017) ("Shall means must.").
"[E]ach village must have a marshal, designated chief of police, and the mayor must, when
provided for by the legislative authority of a village, and subject to its confirmation, appoint all
deputy marshals, police officers, night guards, and special police officers."  21 Ohio Jur. 3d
Counties, Etc. § 560 (footnotes omitted).  "In a village, the marshal is the executive head, under
the mayor, of the police force."  *Id.* at § 561.

The "Captain" referenced in the contract was endowed with authority akin to a village marshal.  (*Compare* Doc. 69-1 at 2362, 2364-66 *with* Ohio Rev. Code §§ 733.23, 737.15, 737.18.)  Lakemore complied with Ohio law during the time when the contract was in place. Kenneth Ray fulfilled the role of a marshal by serving in the Captain position outlined in the contract.

### 4.    The Mayor

Plaintiffs argue that Mayor Justice still had a supervisory role with respect to policing. (Doc. No. 74 at 25220-21; Doc. No. 75 at 2601-02.)  As a general matter, Plaintiffs are correct that having a named marshal does not itself rule out any potential policymaking by a mayor with respect to policing.  *See* Ohio Rev. Code § 737.18 ("The marshal shall be the peace officer of a village and the executive head, under the mayor, of the police force.").

> It is [ ] well settled that the mayor of a city is "chief conservator of peace within the city."  R.C. 733.03.  As such he clearly has the authority and duty to investigate into matters which threaten that peace.  Such power cannot be bargained away and any contract provision that attempts to do so must be void.  Likewise, . . . nothing which prohibits the chief of police from conducting his own investigation as per the contract.  However, the contract cannot be used to prevent the mayor from performing his duties as chief conservator of the peace.

*Fraternal Ord. of Police, Lodge No. 3 v. City of Lorain*, C.A. No. 3311, 1982 WL 5104, at *1 (Ohio Ct. App. 1982).

Section 505.50 allows a township and village to agree on any terms they see fit for the latter to engage the former's police department so long as (1) the legislative body of each jurisdiction approves the terms and (2) what they agree upon does not contravene Ohio statutes. *See* Ohio Rev. Code § 505.50; *Golem v. Village of Put-In-Bay*, 222 F. Supp. 2d 924, 931 (N.D. Ohio 2002) ("The Ohio Constitution allows municipalities to 'exercise all powers of local self-government and to adopt and enforce within their limits such local police . . . and other similar

regulations, *as are not in conflict with general laws*.'") (emphasis added; quoting OHIO CONST. art. XVIII, § 3)).  Lakemore provided no legal authority to support the notion that Lakemore officials would be precluded from oversight as to police officers patrolling inside Lakemore.  And the contract with Springfield Township did not eliminate or preclude input from Lakemore or its mayor.  The contract preserved Lakemore's policymaking role, including by its participation in the joint review committee.

For the reasons above, the argument that the contract with Springfield Township would categorically preclude Lakemore's potential liability in connection with policing inside Lakemore is incorrect as a matter of law.  However, as discussed below, Plaintiffs' evidence does not establish the requisite policies necessary to impose liability under *Monell* for the particular claims at issue.

### D.    Count One – Unlawful Search and Seizure

In Count One, Plaintiffs contend that Defendants' search and seizure of Plaintiffs' property was not supported by probable cause.  (Doc. No. 1-1 at 22; Doc. No. 75 at 2602.)  In support, they rely on the Beckers' accusations that Officer Mizer made false statements in her affidavit.  (*See* Doc. No. 75 at 2603-04.)  Plaintiffs also characterize Mayor Justice's deposition testimony as acknowledging that he played a role in the investigation, which Plaintiffs assert is consistent with Ohio statutes providing that the mayor's role includes overseeing law enforcement practices within the municipality.  (*See id.* at 2604.)

The Fourth Amendment protects individuals from unreasonable searches or seizures.  *Gardenhire v. Schubert*, 205 F.3d 303, 312-13 (6th Cir. 2000).  "It is clearly a violation of the Fourth Amendment for police officers acting in a law-enforcement capacity to seize a person and search his home without probable cause."  *McKenna v. Edgell*, 617 F.3d 432, 445 (6th Cir. 2010).  A probable cause determination must rest on "reasonably reliable information that the

20

suspect has committed a crime," based on "the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence." *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (cleaned up).  In retroactively considering whether probable cause existed, a court looks only to "the information possessed by the arresting officer at the time of the arrest." *Id*. at 501 (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)).

The Sixth Circuit recently framed the inquiry for this type of Section 1983 claim as involving two "critical questions."  *Harris v. City of Saginaw*, 62 F.4th 1028, 1033 (6th Cir. 2023).  "First, did the Officers lack probable cause . . . ?  And if so, were any or all of the defendants personally involved . . . ?  'If a reasonable jury could answer 'yes' to both questions, this case must proceed to trial.'"  *Id*. (quoting *Gardenhire*, 205 F.3d at 313).

### 1.      Mayor Justice's Motion

Mayor Justice seeks summary judgment on the Fourth Amendment claim for two reasons.  (Doc. No. 70 at 2401-02.)  First, he argues that Officer Mizer substantiated the existence of probable cause, which two judges found to exist in approving search warrants.  (*See id.*)  Second, Mayor Justice contends that he neither initiated the investigation nor participated in the execution of the search warrants.  (*Id.* at 2402.)

In a similar vein, Lakemore's motion argues that "there can be no liability for the Village based upon the state court authorized search warrants and/or subsequent seizure of property by STPD because that would do nothing more than impose *respondeat superior* liability."  (Doc. No. 69 at 2351.)

### a)      Search Warrants Obtained by Officer Mizer

There are fact disputes in the record with regard to how Officer Mizer conducted the investigation and obtained search warrants.  Were a jury to accept the version of events described

in the affidavits of Becker and her daughter B. Becker, then Officer Mizer's reliance on the search warrants could be precluded as a matter of law.

Officer Mizer described Becker victim of a forgery in the affidavits in support of the search warrants. Plaintiffs submitted an affidavit from Becker in which she denied and repudiated much of what Officer Mizer averred in support of the search warrants used to seize Plaintiffs' property. (*See* Doc. No. 74-1 at ¶¶ 8-10; *see also* Doc. No. 74-2 (affidavit of B. Becker).) Becker recounted that Officer Mizer "terrified" and "terrorized" her, including with threats of going to prison for mortgage fraud. (Doc. No. 74-1 at ¶¶ 3, 6, 13.)

The upshot of Plaintiffs' affidavits from Becker and B. Becker is to cast doubt on whether there was a genuine basis for the existence of probable cause prior to the search and seizure of Plaintiffs' property. Such facts, if proved, could create legal exposure for Officer Mizer. But they also could preclude any reliance on the search warrants as being demonstrative of genuine probable cause.

"Police officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006). "Thus, an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989).

> Warrants are typically a defense because they demonstrate probable cause. But warrants do not demonstrate probable cause if the officer ma[de] false statements and omissions to the judge and if probable cause would not exist but for those false statements or omissions. In these limited circumstances, officers may be held liable for their searches, seizures, and arrests even though they obtained a warrant.

*Novak v. City of Parma*, 932 F.3d 421, 435 (6th Cir. 2019) (quotations omitted).

Plaintiffs dropped previously asserted claims against Officer Mizer, pleading: "Officer

Jamie Mizer has been removed as a Defendant, but the factual allegations regarding her actions remain as her actions were at the direction or to further the mission of her superiors."  (Doc. 1-1 at ¶ 2.)[8]  In light of their litigation strategy, it becomes incumbent upon Plaintiffs to make an evidentiary showing of personal direction or participation to render an individual supervisor like the Mayor personally liable.  To hold Lakemore liable, the required evidentiary showing goes to policy or custom.  Plaintiffs do not make those showings.

### b)  The Mayor's Role Prior to the Search Warrants

To hold Mayor Justice liable, Plaintiffs have the burden to show that Mayor Justice "either encouraged the specific incident of misconduct or in some other way directly participated in it."  *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (citations and quotations omitted).  "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Id.* (quoting *Hays*, 668 F.2d at 874).

Based on the deposition testimony from witnesses and other evidence in the record, Mayor Justice is entitled to judgment as a matter of law on Count One.  The only conclusion that a reasonable jury could reach is that Mayor Justice did *not* initiate, control, or carry out the search and seizure.

Captain Ray testified that Mayor Justice did not request, urge, or instigate the investigation of Plaintiffs.  (Doc. No. 38-2 at 329.)  Captain Ray – not Mayor Justice – supervised Officer Mizer with respect to her investigation of Plaintiffs.  (*Id.* at 333-35.)  Officer Mizer confirmed that Mayor Justice did not direct her to open an investigation.  (Doc. No. 38-4 at 451.)  Finally, Mayor Justice testified that he neither directed nor authorized the investigation

---

[8] Plaintiffs also dismissed claims against Captain Ray.  (Doc. Nos. 82, 83.)

and the search warrant applications.  (Doc. No. 38-1 at 284-85.)

Officer Mizer testified that when her investigation began, she conducted it in good faith and mentioned no influence from Mayor Justice.  (*See* Doc. No. 38-3 at 376.)  Officer Mizer specifically distinguished her initial investigation and the search warrants from events that occurred later, *after* Plaintiffs' property had been seized.  Although Officer Mizer later came to believe that Mayor Justice had personal motives against Plaintiffs, none of those affected her investigation or obtaining the search warrants.

> A:   . . . I do not feel that the execution of those search warrants was anything that was pushed upon me.  It was observations and evidence we had obtained up to that point, statements and factual evidence and deeds and whatnot, and that was the basis for the search warrant.  It had nothing to do with who wanted me to do what at that point.  It's where the evidence took us.
>
> Q:   Yeah, but after the search warrants, Ms. Mizer, didn't you have a change of heart?
>
> A:   I did not have a change of heart about what I was doing, how I was conducting myself and how I was investigating it.  I did begin to have a change of heart as to why there was such an emphasis on this case.  * * *

(*Id.*)

Officer Mizer later stated that Mayor Justice's interest regarding potential criminal charges against Plaintiffs came to her attention and aroused her suspicion of Mayor Justice.  Eventually, she felt that Captain Ray and Mayor Justice were pressuring her.  (*Id.* at 382, 391.)  She also speculated that either Captain Ray or Mayor Justice stole Cook's cell phone from the evidence room.  (*Id.* at 392.)  But Officer Mizer's opinions were based on actions taken *after* Plaintiffs' property had already been seized.  (*See id.* at 375-79.)

In sum, when Officer Mizer investigated Plaintiffs, sought search warrants, and executed those warrants with her colleagues in the STPD, Mayor Justice was not controlling, directing, or participating in those law enforcement activities.  At most, Officer Mizer kept both Captain Ray

and Mayor Justice apprised of her ongoing actions.  Officer Mizer, however, was not feeling pressured or directed by Mayor Justice at that time.

Plaintiffs' Fourth Amendment claim against Mayor Justice also rests on his statutory and contractual right – or, as Plaintiffs see it, duty – to oversee policing within Lakemore.  But "[t]he law is clear that liability of supervisory personnel must be based on more than merely the right to control employees.  Without more, such a theory would allow liability on a *respondeat superior* basis – a basis expressly rejected by the Supreme Court . . . ."  *Hays v. Jefferson Cnty.*, 668 F.2d 869, 872 (6th Cir. 1982); *see also Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976); *Jones v. City of Memphis*, 586 F.2d 622, 623 (6th Cir. 1978).

Plaintiffs' evidence never demonstrates Mayor Justice's knowledge of the particulars of Officer Mizer's pre-search investigation.  There is no evidence Mayor Justice encouraged any particular investigatory tactic before the search warrants.

Plaintiffs' evidence and the record as a whole would not allow a reasonable jury to hold Mayor Justice liable for the search and seizure of Plaintiffs' property.  For the reasons above, Mayor Justice's motion for summary judgment on Count One is granted.

## 2.     Lakemore's Motion

The motion challenged Plaintiffs to "identify a Lakemore policy, promulgated by an officer with final policymaking authority, which was the moving force behind any claimed constitutional violation.  Absent the identification of such a policy, Plaintiffs' *Monell* claim fails as a matter of law."  (Doc. No. 69 at 2351.)  *See generally Hartwig v. Nat'l Broad. Co.*, 76 F.3d 379 (6th Cir. 1996) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.") (citing *Celotex*, 477 U.S. at 323).  No particular policy was identified.

25

Alternatively, Plaintiffs invoke the Supreme Court's decision in *Pembauer*, 475 U.S. at 480, recognizing that a single decision by a municipal policymaker might itself constitute an actionable policy depending on the circumstances.  (*See* Doc. No. 74 at 2521.)  Plaintiffs urge that "Mayor Justice, with final decision-making authority over the police powers of Lakemore, allowed the investigation and raids to go forwards, and even supported the actions of Lakemore and Springfield Township Police Department."  (*Id.*)

Upon scrutiny, however, the Mayor's knowledge pre-search came solely from a conversation where Officer Mizer let the Mayor know that she was conducting an investigation. Mayor Justice "couldn't follow the logic of the whole thing, [but] her point was, she felt there was something going wrong there, and she wanted to investigate . . . ."  (Doc. No. 38-1 at 284; *see also* Doc. No. 74 at 2506.)[9]

There is no evidence of the Mayor actually *doing* anything related to the search and seizure prior it occurring on March 16, 2016.  This non-action and cursory knowledge on the part of Mayor Justice is not the sort of deliberate action by a policymaker that can be deemed tantamount to an official policy for the Village.  As such, Plaintiffs' evidence and arguments do not show that a municipal policy was the moving force behind the search and seizure of Plaintiffs' property.

### 3.    Municipal Non-Action

Plaintiffs next point to the village-township contract and Mayor Justice's testimony that not much was ever done on the joint review board.  This reflects a policy of inadequate training

---

[9] The date of the officer-mayor conversation is never made clear in the record.  It occurred sometime in the three months following Officer Mizer's encounter with a resident named Andrew Miller on January 2, 2016.  (*See* Doc. No. 74 at 2505; Doc. No. 38-1 at 284; Doc. No. 38-3 at 367.)

and supervision, Plaintiffs suggest.  (Doc. No. 74 at 2522-23.)

> [A] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.  Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under [Section] 1983.

*Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (quotations and citations omitted).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 398 (1997)).  An examination of Plaintiffs' arguments and evidence indicates that they do not make a showing of deliberate indifference.  Plaintiffs do not address training or supervision deficiencies regarding the alleged dubious tactics of Officer Mizer, such as in her interactions with Becker or in the way she drafted affidavits in support of search warrant applications.  Moreover, there is no discussion of alternatives that would demonstrate a deliberate choice on the part of the Village.

Finally, Plaintiffs bemoan the suggestion from Defendants that they had no particular policies in place for police practices during the contract with Springfield Township.  Plaintiffs do not provide evidence or a convincing argument that Lakemore's hands-off approach in deference to Springfield Township was itself designed to allow constitutional violations to fester. "[M]unicipal liability under [Section] 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . ." *Pembaur*, 475 U.S. at 483.  Plaintiffs do not identify a STPD policy that, even if adopted by Lakemore, caused an injury to Plaintiffs. *See Graham*, 358 F.3d at 382.

For the reasons above, Lakemore's motion for summary judgment on Count One is granted.

**E.      Count Two – Retaliation in Violation of the First Amendment**

In Count Two, Plaintiffs claimed that Richard Cook's support for Susan Lindsley's

mayoral challenge prompted retaliation by the Defendants.  (Doc. 1-1 at 23; Doc. No. 75 at

2610.)

> As a general matter the First Amendment prohibits government officials from
> subjecting an individual to retaliatory actions for engaging in protected speech.  If
> an official takes adverse action against someone based on that forbidden motive,
> and non-retaliatory grounds are in fact insufficient to provoke the adverse
> consequences, the injured person may generally seek relief by bringing a First
> Amendment claim.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citations and quotations omitted); *see also*

*Novak*, 932 F.3d at 427.

"The law is well settled in this Circuit that retaliation under color of law for the exercise

of First Amendment rights is unconstitutional . . . ."  *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir.

1994); *see also Holzemer v. City of Memphis*, 621 F.3d 512, 527-28 (6th Cir. 2010).

> To prevail, [a plaintiff] must demonstrate . . . (1) that he engaged in constitutionally
> protected speech, (2) that he suffered an adverse action likely to chill a person of
> ordinary firmness from continuing to engage in protected speech, and (3) that the
> protected speech was a substantial or motivating factor in the decision to take the
> adverse action.

*Wood v. Eubanks*, 25 F.4th 414, 428 (6th Cir. 2022) (quotations omitted).  "In a First

Amendment retaliatory-prosecution claim . . . a plaintiff must also show that the prosecution

lacked probable cause."  *Rapp v. Putman*, 644 F. App'x 621, 624 (6th Cir. 2016) (citing *Barnes v*

*Wright*, 449 F.3d 709, 720 (6th Cir. 2006)); *see also Wood*, 25 F.4th at 428 n.4; *Barnet*, 449 F.3d

at 719 ("'want of probable cause must be alleged and proven' by a plaintiff bringing a § 1983 . . .

suit for retaliatory prosecution" (quoting *Hartman v. Moore*, 547 U.S. 250, 252 (2006)).[10]

---

[10] Recently the Supreme Court adopted the "no probable cause" rule as an element for First
Amendment claims alleging retaliatory arrests by police.  *Wood*, 25 F.4th at 428 n.4 (citing

Mayor Justice argues that (1) Plaintiffs did not engage in First Amendment protected activity, (2) Cook's freedom of speech was not hampered,[11] and (3) he "had zero involvement in the investigation and searches of Plaintiffs' home and business."  (Doc. No. 70 at 2403.)  Lakemore's motion similarly argued:

> While there is a reference to non-party Lindsley having run for Village of Lakemore Mayor in November 2015 and allegedly raising matters of public concern (for which Plaintiffs would have no legal standing to assert), there are no allegations of First Amendment activity by the corporate Defendants.  And, other than a passing reference to Cook supporting Lindsley in her candidacy for Mayor, there are no other allegations in the Complaint regarding alleged First Amendment activity by Plaintiff Cook.

(Doc. No. 69 at 2352.)

### 1.          The Company Plaintiffs

Plaintiffs' submissions make no evidentiary showing or legal argument tying the companies TMK, Middlebury Banc, and Whole-Sale Bedding to Susan Lindsley's mayoral campaign.  Nor do Plaintiffs argue that those companies engaged in protected expression or were later dissuaded from doing so.  *See generally Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010) (rejecting the argument that political speech of corporations should be treated differently under the First Amendment simply because such associations are not natural persons).

Accordingly, Defendants' motions are granted with respect to the claims in Count Two of TMK, Middlebury Banc, and Whole-Sale Bedding.

---

*Nieves*, 139 S. Ct at 1724-25).  This Court has elsewhere explained why that rule also applies to other forms of retaliatory adverse action by the government, including property seizure.  *See generally Fambrough v. City of E. Cleveland,* No. 1:22-cv-00992, 2023 WL 5207284, at *7-13 (N.D. Ohio Aug. 14, 2023)

[11] Defendants' second point is not well taken.  "[T]he adverseness inquiry is an objective one, and does not depend upon how the particular plaintiff reacted."  *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002)

### 2. Richard Cook

With respect to Cook, the evidentiary showing is scarcely better.

To begin, there is no question that – as a matter of law – showing support for a political candidate is a form of expression protected by the First Amendment.  "The right of political association is a well established right under the First Amendment . . . ."  *Sowards v. Loudon Cnty.*, 203 F.3d 426, 432 (6th Cir. 2000) (citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990) and *Elrod v. Burns*, 427 U.S. 347, 356 (1976)).  "[T]he First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'"  *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191-92 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).  "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association.  When an individual contributes money to a candidate, he exercises both of those rights: The contribution serves as a general expression of support for the candidate and his views' and 'serves to affiliate a person with a candidate.'"  *Id.* at 203 (quoting *Buckley v. Valeo*, 424 U.S. 1, 15, 21-22 (1976)).

Plaintiff acknowledges that a "First Amendment retaliation claim looks to the motives behind adverse actions."  (Doc. No. 74 at 2526.)  The problem here is that Cook does not point to *evidence* that shows his political activity prompted the actions taken against him.

With respect to the first element of the cause of action, Plaintiffs only pointed to evidence of political expression by Susan Lindsley as part of her mayoral campaign.  (*See* Doc. No. 74 at 2526.)  Plaintiffs offer attorney arguments that "Richard Cook publicly backed Susan Lindsley's run for mayor" and "Cook was engaged in a constitutionally protected activity in publicly supporting Lindsley's mayoral run."  (*Id.*)  These statements cite only to an allegation from the complaint.  (*See id.*; *cf.* Doc. No. 1-1 at ¶ 18.)

30

There is no admissible evidence cited in Plaintiffs' papers that would allow a jury to find that Cook engaged in political activity or public support for Lindsley's campaign. Plaintiffs "cannot rely only on the pleadings and must designate specific facts showing that there is a genuine issue for trial as supported by affidavits, depositions, answers to interrogatories, and admissions on file, especially [because the] parties have had an opportunity for discovery." *Wilson v. Corizon Health, Inc.*, No. 20-1354, 2021 WL 4955260, at *3 (6th Cir. July 26, 2021). The unsworn allegation in Paragraph 18 of the Complaint is not evidence that would support a jury verdict, and so it does not suffice to withstand summary judgment. *See Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

Nor does Cook provide evidence as to the third element. To show a correlation between the searches and the political activity, Plaintiff points only to the contemporaneous search of Susan Lindsley's home, and that her mayoral campaign signs were seized.[12] Plaintiffs argue that "Political signs have no relevance to an investigation of real estate fraud and forgery." (Doc. No. 74 at 2527.) Perhaps. At most that might support an inference that Lindsley's campaign or her public statements prompted action taken against her. But the taking of her signs does not demonstrate retaliation against Cook.

Plaintiffs' papers read as if the only reason to conduct simultaneous searches of both Cook and Lindsley would have been the latter's political activity. But as Lindsley acknowledged in her deposition, she worked with Plaintiffs doing property management, home rehab, and notarizing documents for real estate transactions. (Doc. No. 72-1 at 2437-39.) Officer Mizer investigated transactions where both Cook and Lindsley were involved, and to this day Officer

---

[12] Plaintiff has not put forward evidence or developed an argument that those signs exceeded the scope of the search warrant.

31

Mizer remains steadfast in her belief that Lindsley had committed crimes.   (*See* Doc. No. 38-3 at 365.)

So there is evidence in the record indicating a non-political, nonretaliatory explanation for the criminal investigations, searches, and seizures.  There is no evidence to substantiate the theory that this retaliation for political activity by Cook.  Despite the absence of citation to evidence required by Rule 56(c), the Court reviewed Cook's deposition testimony in the record.  His testimony included no facts to substantiate the retaliation claim.

> Q:      . . . You brought a First Amendment retaliation claim, correct?
>
> A:      I believe so.
>
> Q:      Okay. What's the basis of that claim?
>
> A:      You'll have to ask the attorneys the legal questions there.  I'm not –
>
> Q.      Rich, this is your lawsuit. I want to know what facts and evidence you're relying upon to assert a First Amendment retaliation claim against Springfield Township.
>
> A:      I'm not sure what the First Amendment claim all entails
>
> * * *
>
> Q:      . . . What have they done to you, or whoever they is, and I would like you to tell me that, that you think is a First Amendment retaliation?
>
> A:      I'm not sure right off the bat.  I'd have to discuss it with my attorney to see – to see what – what's what as far as that language goes.

(Doc. No. 40-1 at 526 (objections omitted).)  Plaintiffs did not submit any affidavit addressing the First Amendments retaliation claim.  In short, there is no evidence to show that Plaintiffs satisfy the first or third elements of their claim.

For these reasons, Defendants' motions as to Cook's claim in Count Two are granted.

### F.      Count Three – Substantive Due Process

Plaintiffs argue that that their substantive and procedural due process rights were violated

during the search, seizure, and retention of their property.  Under the Fourteenth Amendment,

"[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

U.S. Const. amend. XIV, § 1.  The due process clause has both procedural and substantive

components.  *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012).

> Substantive due process is the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.  It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that shock the conscience.  It also protects the right to be free from arbitrary and capricious governmental actions, which is another formulation of the right to be free from conscience-shocking actions.

*Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (cleaned up).

The Supreme Court has "always been reluctant to expand the concept of substantive due

process . . . ."  *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992).  As to claims regarding the

lawfulness of a seizure, Defendants rightly note that the Supreme Court held in 1989: "Because

the Fourth Amendment provides an explicit textual source of constitutional protection against

this sort of physically intrusive governmental conduct, that Amendment, not the more

generalized notion of 'substantive due process,' must be the guide for analyzing these claims."

*Graham v. Connor*, 490 U.S. 386, 395 (1989).

The Supreme Court thereafter declined "to recognize a substantive right under the Due

Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon

probable cause."  *Albright v. Oliver*, 510 U.S. 266, 268 (1994) (plurality).  "The protections of

substantive due process have for the most part been accorded to matters relating to marriage,

family, procreation, and the right to bodily integrity."  *Id.* at 272.  "The Framers considered the

matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."  *Id.* at

274.  The same goes for searches and pretrial seizures of property.  *See Cnty. of Sacramento v.*

*Lewis*, 523 U.S. 833, 843 (1998) ("Substantive due process analysis is . . .  inappropriate in this case only if [plaintiffs'] claim is 'covered by' the Fourth Amendment.  The Fourth Amendment covers . . . 'searches and seizures' . . . .").

It is mistaken to suggest that a substantive component of the Fifth or Fourteenth Amendments would prohibit the government from depriving a citizen of property.  Indeed, the Constitution recognizes that property may be taken so long as the government affords due process and/or just compensation.  *See* U.S. Const., amend. V (". . . nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation"); *id.*, amend. XIV (". . . nor shall any State deprive any person of life, liberty, or property, without due process of law").

Plaintiffs correctly point to the fundamental place of liberty and property rights in our legal heritage.  (Doc. No. 74 at 2528-29.)  They complain of searches and seizures of property prompted by a possibly specious assertion of probable cause, as well as alleged deliberate indifference to unconstitutional police conduct.  But all those constitutional commitments and concerns sit squarely in the realm of the Fourth Amendment, leaving no room for and no reason to inject a substantive due process analysis.  *See, e.g.*, *Est. of Fluegge v. City of Wayne*, 442 F. Supp. 3d 987, 996 (E.D. Mich. 2020).

Defendants' motions are granted as to the substantive due process claim in Count Three.

### G.   Count Three – Procedural Due Process

Plaintiffs claimed their property was taken "without proper or adequate procedures." (Doc. 1-1 at 23.)  "To establish a procedural due process claim, a plaintiff must show that (1) [he] had a life, liberty, or property interest protected by the Due Process Clause; (2) [he] was deprived of this protected interest; and (3) the state did not afford [him] adequate procedural rights."  *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (citations omitted).

"The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard 'in a meaningful manner.'" *Engler v. Arnold*, 209 F. Supp. 3d 988, 991 (N.D. Ohio 2016), *aff'd*, 862 F.3d 571 (6th Cir. 2017) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)).  The Supreme Court has explained that "a deprivation of a constitutionally protected property interest caused by a state employee's random, unauthorized conduct does not give rise to a § 1983 procedural due process claim unless the State fails to provide an adequate post-deprivation remedy." *Zinermon v. Burch*, 494 U.S. 113, 115 (1990) (discussing *Parratt v. Taylor*, 451 U.S. 527 (1981) and *Hudson v. Palmer*, 468 U.S. 517 (1984)).

Here, Plaintiffs did not demonstrate that the State of Ohio, Springfield Township, or Lakemore failed to provide any meaningful post-deprivation remedy.  (*See* Doc. No. 74 at 2529-30.)  So, even drawing inferences in Plaintiffs' favor with regard to Officer Mizer's potentially errant conduct, Plaintiffs did not develop a legal argument or evidentiary showing of a denial of a post-deprivation remedy.  "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (same); *Engler*, 209 F. Supp. 3d at 991-92 (same).

Defendants' motions are therefore granted as to the procedural due process claim in Count Three.

### H.    Count Four – Denial of Access to the Courts

Plaintiffs raise a claim for denial of access to the courts.  (Doc. No. 1-1 at 24.)  The allegation is that Defendants' actions "denied [Plaintiffs] their ability to access a court of law." (*Id.*)

In some contexts, denying access to courts would sustain a viable cause of action under Section 1983.  For example, incarcerated persons physically cannot access a courthouse or court

35

clerk's office, and so they literally might be deprived of such access.  To that end, there are things that prison officials must do or allow to secure inmates' right of access to the courts.  *See generally Bounds v. Smith*, 430 U.S. 817, 828 (1977); *Lewis v. Casey*, 518 U.S. 343, 346 (1996).

Outside of prison, however, the claim takes a different shape.  "Access to courts does not only protect one's right to physically enter the courthouse halls, but also insures that the access to courts will be adequate, effective and meaningful. . . . Therefore, if a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts."  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997) (quotations and citations omitted).  "Before filing an 'access to courts' claim, a plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess whether such access was in fact 'effective' and 'meaningful'?"  *Id.* at 1264.

This case bears no similarity to the precedent cases this Court has reviewed which either recognize or apply a cause of action for denial of access to the courts.  Plaintiffs have not identified such a precedent.

Notwithstanding, the Court holds that this claim fails as a matter of law for several reasons.  First, Plaintiffs sued Defendants in the present action, which now affords Plaintiffs an opportunity for judicial redress in this federal forum.  Second, none of Plaintiffs' claims in the instant matter have been challenged on limitations grounds.  Defendants did not delay or stymie Plaintiffs' claims.  Third, Plaintiffs have not demonstrated that Defendants concealed or destroyed evidence such that Plaintiffs lost a claim or a remedy by virtue of spoliated evidence.  Fourth, Plaintiffs filed a state court replevin action to obtain the return of previously seized property.  Plaintiffs thus cannot claim that they were deprived of access to state courts.

For the reasons above, Defendants' motions as to the denial of access to courts claim in

36

Count Four are granted.

## I.     Count Five – Abuse of Process

Plaintiffs alleged an abuse of process claim, which incorporated the entire body of their

allegations, (*see* Doc. No. 1-1 at 24), and then concluded as follows:

> The Defendants improperly used civil and criminal legal proceedings for an
> unintended, malicious, or perverse reason and for which those proceedings were
> not intended.  The Defendants had an improper and ulterior motive in using these
> processes.  As a direct and proximate result of the Defendants' misconduct, the
> Plaintiffs were damaged and . . . deprived Plaintiffs of their civil rights as secured
> by the United States Constitution and through 42 U.S.C. § 1983.

(Doc. No. 1-1 at 24-25.)

The Sixth Circuit observed in one unpublished decision that "a federal abuse of process

claim does not exist in the law of this circuit."  *Rapp v. Dutcher*, 557 F. App'x 444, 448 (6th Cir.

2014); *see also Moore v. WesBanco Bank, Inc.*, 612 F. App'x 816, 823 (6th Cir. 2015).  But on

other occasions, the Sixth Circuit acknowledged that an abuse of process claim might be viable

under § 1983 and would mirror the relevant state law cause of action.  *See Garcia v. Thorne*, 520

F. App'x 304, 311 (6th Cir. 2013).

> If such a claim is cognizable as a federal constitutional claim, . . .  the elements
> necessary to prove it would likely mirror those of state law.  Under Ohio law:
>
> The three elements of the tort of abuse of process are: (1) that a legal proceeding
> has been set in motion in proper form and with probable cause; (2) that the
> proceeding has been perverted to attempt to accomplish an ulterior purpose for
> which it was not designed; and (3) that direct damage has resulted from the
> wrongful use of process.

*Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 676-77 (6th Cir. 2005) (citations and

quotations omitted).[13]

---

[13] In *Grise v. Allen*, 714 F. App'x 489, 495-96 and n.4 (6th Cir. 2017), the Sixth Circuit assumed
that an abuse of process claim could not exist where probable cause had been found or stipulated.
That assumption would not be correct for events in Ohio, where an abuse of process claim

An abuse of process claim is available under Ohio law only if there *was* probable cause to support the initial law enforcement actions taken.  But here, Plaintiffs' claims and evidence supporting Counts One and Two depend on the *absence* of probable cause.  Although Plaintiffs were permitted to plead in the alternative, they have since committed to the position that no probable cause existed.  In light of that position, Defendants are entitled to judgment as a matter of law.  Their motions as to Count Five are granted.

For his part, Mayor Justice also asserts qualified immunity.  Plaintiffs must show that (a) the defendant violated a constitutional right and (b) that right was clearly established.  *E.g.*, *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013).  To determine if the law is clearly established, the Court looks principally to Sixth Circuit and Supreme Court caselaw.  *See Coley v. Lucas Cty.*, 799 F.3d 530, 540 (6th Cir. 2015); *Perez v. Oakland Cty.*, 466 F.3d 416, 427 (6th Cir. 2006).  "The dispositive inquiry, undertaken in light of the specific context of the case, and not as a broad general proposition, is whether the violative nature of particular conduct [wa]s clearly established."  *Sumpter v. Wayne Cty.*, 868 F.3d 473, 485 (6th Cir. 2017) (quotation and editorial marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Plaintiffs failed to cite any case law or to develop a legal argument to meet their burden.  As a result, they have not overcome Mayor Justice's qualified immunity defense.  For this additional reason, Mayor Justice's motion as to Count Five is granted.

### J.    Count Six – Civil Conspiracy

Plaintiffs pleaded in Count Six a civil conspiracy under federal and state law.

---

presumes the existence of probable cause.  *See Robb v. Chagrin Lagoons Yacht Club, Inc.*, 662 N.E.2d 9, 14-15 (Ohio 1996).  Under Ohio law: "'[A]buse of process' differs from 'malicious prosecution' in that the former connotes the use of process properly initiated for improper purposes, while the latter relates to the malicious initiation of a lawsuit which one has no reasonable chance of winning."  *Id.* (quoting *Clermont Envtl. Reclamation Co. v. Hancock*, 474 N.E.2d 357, 362 (Ohio Ct. App. 1984)).

The Defendants engaged in a malicious combination to damage, harm, and otherwise deny the Plaintiffs their civil rights, through improper means as set forth herein. As a direct and proximate result of the Defendants' conspiracy, the Plaintiffs were harmed, damaged, denied their civil rights and otherwise sustained losses. The Defendants' conspiracy also deprived Plaintiffs of their civil rights as secured by the United States Constitution and through 42 U.S.C. § 1983. The Defendants' conspiracy also violated the laws of Ohio and the Ohio Constitution and was willful, wanton, reckless, malicious and without legal justification.

As a direct and proximate result of the Defendants' conspiracy, the Plaintiffs sustained injuries, damages and a violation of their civil rights.

(Doc. No. 1-1 at 25, ¶¶ 73-74.)

A civil conspiracy claim under Section 1983 requires that (1) a single plan existed, (2) that defendants shared in a general conspiratorial objective to deprive plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiffs. *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 767-68 (6th Cir. 2020).

Plaintiffs' briefs in opposition to the motions for summary judgment develop no legal argument with respect to conspiracy under federal law. (*See* Doc. Nos. 74, 75.) Moreover, in opposition to Mayor Justice's motion, Plaintiffs refer to Count Six as a state law claim. (Doc. No. 75 at 2611.) Plaintiffs thus abandoned any Section 1983 conspiracy claim. *See generally Brown v. VHS of Michigan, Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013); *see also Hicks v. Concorde Career Coll.*, 449 Fed. App'x 484, 487 (6th Cir. 2011). For these reasons, the Section 1983 claim in Count Six is dismissed.

Under Ohio law, "the following elements must be proven in order to establish a claim of civil conspiracy: '(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy.'" *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 538 (6th Cir. 2000) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993)).

The only portion of Count Six that Plaintiffs addressed in their papers – and thus have not waived and abandoned – is a state law civil conspiracy claim against Mayor Justice.  (*See* Doc. Nos. 74, 75.)  An Ohio law civil conspiracy claim requires the plaintiff to show that the defendants engaged in an "unlawful act independent from the actual conspiracy."  *Aetna*, 219 F.3d at 538 (citations and quotations omitted).  "A civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy."  *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 711-12 (Ohio Ct. App. 2009).

 Plaintiffs have not shown the requisite underlying tort.  Accordingly, Plaintiffs' civil conspiracy claims are dismissed because they have either been abandoned or are not supported by evidence.

### K.    State Law Claims Against Lakemore

Lakemore moved for summary judgment on Plaintiffs' state law claims asserting immunity for political subdivisions under Chapter 2744 of the Ohio Revised Code.  (*See* Doc. No. 69 at 2357-58.9.)  Plaintiffs' opposition brief made no legal argument to salvage any state law claim against Lakemore.  (*See* Doc. No. 74.)  On reply, Lakemore correctly pointed out that by failing to respond to the motion on these claims and rebut immunity defense under Chapter 2744, Plaintiffs abandoned their state law claims against the municipality.  (*See* Doc. No. 77 at 2629 nn.1-2.)

This Court concludes that Plaintiffs have waived and abandoned their state law claims against Lakemore.  *See generally Clark v. City of Dublin*, 178 Fed. App'x 522, 525 (6th Cir. 2006).  The "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *VHS of Michigan*, 545 Fed. App'x at 372; *see also Hicks v. Concorde Career Coll.*,

449 Fed. App'x 484, 487 (6th Cir. 2011); *Colston v. Cleveland Pub. Library*, No. 1:12-cv-204, 2012 WL 3309663, at *2 n. 2 (N.D. Ohio Aug. 13, 2012) (deeming a claim abandoned and granting summary judgment when a plaintiff "did not respond or even mention [the] claim in her opposition to Defendants' motions for summary judgment").

For the reasons above, Plaintiffs' claims against Lakemore in Counts Seven, Nine, Ten, Eleven, Twelve, and Thirteen are dismissed.

### L.      Count Seven – Spoliation

Plaintiff contends in Count Eleven that Mayor Justice is liable for spoliation of evidence because some of Cook's property stored in a Lakemore evidence room went missing.

> The Ohio Supreme Court has recognized a free-standing cause of action for spoliation of evidence.  The elements of a claim for spoliation are: '(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts.'

*Burgess v. Fischer*, 735 F.3d 462, 481 (6th Cir. 2013) (quoting *Smith v. Howard Johnson Co.*, 615 N.E.2d 1037, 1038 (Ohio 1993)); *cf. Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (applying federal law for spoliation sanctions in a federal proceeding).  Plaintiffs have not met their summary judgment burden on their spoliation claim.

"The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case.  The plaintiff must present more than a mere scintilla of evidence in support of [its] position; the plaintiff must present evidence on which the jury could reasonably find for the plaintiff." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (quotation omitted).  Officer Mizer testified that she saw Mayor Justice in that evidence room along with Captain Ray.  She believes, though she has no evidence or firsthand knowledge, that Mayor Justice or Captain Ray took a cellular phone belonging to Cook from that evidence room.

There is no testimony from Officer Mizer or any other witness with firsthand knowledge regarding cash that Cook contends was not returned.

"Such speculation . . . is insufficient to defeat summary judgment.  A party cannot defeat summary judgment with '[c]onclusory allegations, speculation, and unsubstantiated assertions.'" *Jennings v. Cnty. of Monroe*, 630 F. App'x 547, 555 (6th Cir. 2015) (quoting *Gooden v. City of Memphis Police Dep't*, 67 Fed. App'x 893, 894 (6th Cir. 2003)); *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (holding that "a party may not avoid summary judgment by resorting to speculation, conjecture, or fantasy") (quotation omitted). Plaintiffs do not present evidence or develop an argument to show willful destruction of evidence by Mayor Justice designed to disrupt their case.  Moreover, Plaintiffs have not presented evidence or developed an argument showing how, if at all, their litigation has been disrupted.

For the reasons above, Mayor Justice's motion as to Count Seven is granted.

### M.    Count Eight – Municipal Liability

As previously stated, to establish a *Monell* claim, the plaintiff must prove that a constitutional violation occurred and that the municipality is responsible for the violation.  *See Pollard*, 780 F.3d at 404; *Dibrell*, 984 F.3d 1165.  The Court has already determined that Plaintiffs have either failed to present evidence of a constitutional violation or that Lakemore is liable for the alleged violation.  Lakemore's motion is just granted as it relates to this claim.

### N.    Count Nine – Tortious Interference with Contract or Business Relationships

In Count Nine, Plaintiffs pleaded that "Defendants were aware of the existence of valid contracts and/or business relationships which had the existence of a recognizable economic expectancy between the Plaintiffs and various third parties.  The Defendants intentionally and improperly interfered with these contracts, business relationships and/or economic

expectancies."  (Doc. No. 1-1 at 27.)  Mayor Justice's motion argues that Plaintiffs have no

evidence to support this cause of action or to show Mayor Justice's liability.  (Doc. No.70 at

2408-09.)

> Ohio law recognizes claims for tortious interference with a contract as well as for
> tortious interference with a business relationship.  To prove a claim of tortious
> interference with a contract under Ohio law, a plaintiff must show (1) the existence
> of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's
> intentional procurement of the contract's breach, (4) the lack of justification, and
> (5) resulting damages.  The elements of a claim for tortious interference with
> business relationships are almost identical, the main distinction being that
> interference with a business relationship includes intentional interference with
> prospective contractual relations, not yet reduced to a contract.

*BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc*., 570 F. Supp. 3d 552, 557-58 (N.D. Ohio

2021) (cleaned up).

Plaintiffs presented no evidence of a breach of their contract(s) with others.  They also

presented no evidence of any prospective contractual relationship that was foiled by Mayor

Justice's actions.  Plaintiffs have not produced evidence on those elements for which Plaintiffs

carry the burden of proof.

For these reasons, Mayor Justice's motion as to Count Nine is granted.

### O.    Count Ten – Willful Conduct

In Count Ten, Plaintiffs pleaded that Mayor Justice engaged in willful, wanton, reckless,

and malicious conduct.  (Doc. No. 1-1 at 27-28.)  Mayor Justice's motion argues that this is not a

cause of action under Ohio law.  (Doc. No. 70 at 2398.)

"[R]eckless and wanton conduct is not a separate cause of action under Ohio law."  *Ward*

*v. Cnty. of Cuyahoga*, 721 F. Supp. 2d 677, 694 (N.D. Ohio 2010) (citation and quotations

omitted); *see also Brown v. Whirlpool*, 996 F. Supp. 2d 623, 643 (N.D. Ohio 2014) ("Ohio law

does not recognize a stand-alone cause of action for recklessness . . . .").  "Willful, wanton, and

reckless conduct is technically not a separate cause of action, but a level of intent which negates certain defenses which might be available in an ordinary negligence action." *Cincinnati Ins. Co. v. Oancea,* No. L-04-1050, 2004 WL 1810347, at *3 (Ohio Ct. App. 2004).

For the reasons above, Count Ten is dismissed.

### P.    Count Twelve – Defamation

Mayor Justice moves for summary judgment on Count Twelve, which alleged defamation.  (Doc. No. 70 at 2409.)  Plaintiffs did not address that claim in their opposition.  (*See* Doc. No. 75.)  Plaintiffs have abandoned the defamation claim against Mayor Justice in Count Twelve, as they did against Lakemore (as discussed previously).  *See generally VHS of Michigan,* 545 Fed. App'x at 372; *Clark,* 178 Fed. App'x at 525.  For these reasons, Count Twelve is dismissed.

### Q.    Count Thirteen – Conversion

Plaintiffs contend that Mayor Justice is liable for the conversion of their property.  To establish a claim of conversion, a plaintiff must establish three elements: (1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.  *City of Findlay v. Hotels.Com, L.P.*, 441 F. Supp. 2d 855, 865 (N.D. Ohio 2006).  A plaintiff may claim conversion of money where the defendant is obligated to pay specifically identifiable funds to the plaintiff.  *Id.*; *Davis v. Flexman*, 109 F. Supp. 2d 776, 808 and n. 30 (S.D. Ohio 1999).

Mayor Justice did not seize or store the returned property.  So, the only way Mayor Justice would be liable for conversion is if he took property that had been seized and stored.  That is the theory Plaintiffs espouse, but they have nothing beyond speculation – their own and Officer Mizer's – supporting this legal theory.  "[A] party may not avoid summary judgment by

resorting to speculation, conjecture, or fantasy." *K.V.G.*, 900 F.3d at 823 (quotation omitted). Officer Mizer's "hunch" is not evidence from which a reasonable jury could hold that Mayor Justice converted Plaintiffs' property.

For the reasons above, Mayor Justice's motion as to Count Thirteen is granted.

### R.    Count Eleven – Failure to Intervene

In Count Eleven, Plaintiffs pleaded that "Defendants knew or should have known that other Defendants were violating Plaintiffs rights as protected under the United States Constitution and the laws of the State of Ohio.  These Defendants also had the opportunity to stop the violation of Plaintiffs' rights and/or the ability to prevent the violations from continuing. Despite this knowledge and opportunity, these Defendants failed to take affirmative steps to prevent the Plaintiffs from having their rights further violated."  (Doc. No. 1-1 at 28, ¶ 85.) Plaintiffs argue that Mayor Justice had a duty to act by virtue of his role as chief conservator of the peace and his duties to oversee policing within Lakemore.

### 1.    Legal Standard

"The standard of review for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).  "[T]he inquiry on a motion to dismiss is not whether Plaintiff will be successful on the merits, but simply whether her pleadings are sufficient to state a claim upon which relief can be granted." *Id.* at 726.  "To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).

"For purposes of a motion for judgment on the pleadings, all well-pleaded material

45

allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 479 F.2d 478, 480 (6th Cir. 1973)).  A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

 "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  The function of the Court in ruling on such a motion is not to weigh the evidence, nor to appraise the credibility of witnesses.  *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995); *Jenkins v. Livonia Police Dep't*, No. 13-14489, 2016 WL 759338, at *2 (E.D. Mich. Feb. 26, 2016).

Documents fairly construed as exhibits *to the pleadings* or public records subject to judicial notice are permissible terrain when resolving a Rule 12(c) motion.  *Briggs v. Hogan*, No. 21-5581, 2022 WL 985825, at *2 (6th Cir. Apr. 1, 2022); *see also Barany-Snyder v. Weiner,* 539 F.3d 327, 332 (6th Cir. 2008); *Commercial Money Ctr*, 508 F.3d at 335-36 ("[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss.  In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." (citation omitted)).  But the Court may not consider additional evidence from *outside* the pleadings – without converting the motion to one for summary judgment under Rule 56.  *See*

Fed. R. Civ. P. 12(d).

## 2. Discussion

Defendants' motion for judgment on the pleadings argues that there was no clearly

established right that would render them liable. (Doc. No. 78 at 2648-49.)

> When assessing qualified immunity at the pleading stage, a court must examine the complaint for 'facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right.' Plaintiff must allege facts – not 'legal conclusion[s] couched as . . . factual allegation[s]' – that, when viewed in the light most favorable to plaintiff, 'make out a violation of a constitutional right so clearly established in a particularized sense that a reasonable officer confronted with the same situation would have known that his conduct violated that right.' '[T]he allegations must demonstrate that each defendant officer, through his or her own individual actions, personally violated plaintiff's rights under clearly established law.

*Rapp v. Putman*, 644 F. App'x 621, 627 (6th Cir. 2016) (quoting *Johnson v. Moseley*, 790 F.3d

649, 653 (6th Cir. 2015)).

> [I]t is the plaintiff's burden to convince the court that the law was clearly established at the time of the offensive conduct. In doing so, a plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it. Instead, the plaintiff must show a substantial correspondence between the conduct in question and prior law allegedly establishing the defendant's actions were clearly prohibited. Although the plaintiff need not show that the action at issue has previously been held unlawful, the alleged unlawfulness must be "apparent" in light of preexisting law. In other words, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996) (quotations and citations

omitted).

Plaintiffs have not pointed the Court to caselaw from the Supreme Court or the Sixth

Circuit which endorsed a failure to intervene basis for liability in factual circumstances as are

alleged here. They have not identified cases which clearly established the duty of a mayor to

intervene to prevent or cease the sort of conduct that Officer Mizer engaged in. As Defendants

47

point out, the controlling precedents in this Circuit on failure to intervene claims are primarily in the excessive force context.  No cited cases from the Sixth Circuit recognized or imposed liability for failure to intervene in a search warrant application, the conduct of a search, the storage of seized property as evidence, etc.

In sum, Plaintiffs have not pleaded a claim that Mayor Justice violated a clearly established right by his failure to intervene.  Plaintiffs' claim as pleaded thus does not, as a matter of law, withstand a qualified immunity defense as to Mayor Justice.

Defendants' joint motion also developed an argument – supported by caselaw – that Lakemore and its supervisory officials may not be held liable for a mere failure to act.  (Doc. No. 78 at 2651-53.)  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998), *cert. denied*, 526 U.S. 1115 (1999); *Ashford v. Alexander*, No. 5:07-cv-1491, 2008 WL 906077, at *1 (N.D. Ohio Mar. 31, 2008). Plaintiffs' arguments and caselaw do not distinguish or overcome Defendants' authorities on this point.

To hold Lakemore liable, Plaintiffs must plead the existence of a policy or custom that resulted in the failure to intervene.  *See generally Burgess v. Fischer,* 735 F.3d 462, 477-79 (6th Cir. 2013).  When plaintiffs base a *Monell* claim on what a municipality failed to do, such as a failure to train or to supervise, they "must also show that the municipality lacks such a process out of deliberate indifference for the constitutional violations that may occur as a result." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 492 (6th Cir. 2014); *see also Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012).  Count Eleven does not include allegations of this sort.  Moreover, where the Complaint articulates the policies and customs for which they would hold Lakemore liable, it does not refer to a failure to intervene.  (*See* Doc. No. 1-1 at 26, ¶ 79.)

The Court acknowledges that Plaintiffs' opposition brief pointed to decisions from other jurisdictions where courts have recognized failure to intervene claims outside the excessive force context.  But on the whole, Defendants' arguments and authorities persuade this Court that the Sixth Circuit is unlikely to endorse a failure to intervene theory of liability in these circumstances.

Defendants' motion for judgment on the pleadings on Count Eleven is granted.

## III.  <u>Conclusion</u>

For the reasons above, Lakemore's summary judgment motion is GRANTED.  Mayor Justice's summary judgment motion is GRANTED.   Defendants' joint motion for judgment on the pleadings is GRANTED.  This case is dismissed.


**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
**Date**: September 28, 2023       UNITED STATES DISTRICT JUDGE